IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 20-cv-00964-RBJ

MOHAMMED ELLIOTT,

      Petitioner,

v.

TYLER S. BROWN, in his official capacity as Arapahoe County Sheriff,

      Respondent.

---

## ORDER on HABEAS PETITION

---

      Mohammed Elliott, a pretrial detainee in the Arapahoe County Detention Facility, applies for a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3).  He claims that he is being held in violation of his rights to due process and equal protection under the United States Constitution because he cannot afford to post the bond required by the state court for his release.  The Court has considered the issues raised by the parties in their briefs and in the hearing on the application, and for the reasons set forth herein, denies the application.

## I.  FACTS.

      1.      On August 2, 2019 a UPS driver witnessed what appeared to be an armed robbery at the Robinwood Condominiums in Aurora, Colorado and immediately reported the incident to Aurora police.  Mr. Elliott was arrested later that day and has been in custody since that time.

2.     During a bond hearing held on August 6, 2019, two police officers described information known to them at that time.  Captain Redfearn testified that the UPS driver reported that he saw a black male wearing black shorts and a red shirt getting out of a silver Subaru station wagon tugging back and forth on a bag apparently held by someone in the Subaru.  The black male got out of the Subaru holding the bag.  The person inside got out and confronted the black male who then pulled out a gun and pistol-whipped the victim.  The UPS driver reported that the suspect left in a blue Ford Excursion.  *See* ECF No. 1-12 (transcript) at 6-7, 18-19.  Shortly thereafter, as Captain Redfearn was on his way to the scene, he spotted a blue Ford Excursion driving from the direction of the apartment complex.  He followed the vehicle into the Aurora Mall and found it parked near another vehicle, an orange Kia, with several black males standing in between.  After those individuals walked toward the mall, the officer approached the unoccupied blue Fort Excursion and, by looking through the rear driver's side window, was able to see a silver revolver in a partially open bag on the rear seat.  *Id.* at 11-14.

Another officer observed on a surveillance video that a black male who turned out to be Mr. Elliott got out of the rear driver's side of the blue Ford Excursion wearing a backpack (sometimes referred to as a "bag" in the testimony).  *Id.* at 43-44, 57-59.  He generally matched the description of the assailant provided by the UPS driver, although he apparently was wearing gray sweatpants, and the UPS driver was unable to identify him at a show-up.  *Id.* at 17, 55.  Mr. Elliott went over to the orange Kia and was observed speaking to the driver of the Kia, while still wearing the backpack, and making a "hitting motion" towards him without hitting him.  The gestures were described as commonly associated with pistol-whipping.  *Id.* at 85.  Mr. Elliott went around the Kia, leaned into the passenger side, and helped a disabled male out of the

vehicle and into a wheelchair.  He was no longer wearing the backpack/bag.  *Id.* at 69-70.

Another individual from the blue Ford Excursion, identified as "Mr. Gale," who was wearing an

orange shirt, was seen in the video placing his hand into the rear cargo area of the Kia.  The

backpack Mr. Elliot was wearing was found in the orange Kia, and it contained a loaded

handgun, some marijuana packaging, and marijuana concentrate.  *Id.* at 69-70, 85-86.  Officers

also found a loaded firearm on the passenger seat of the Kia and a firearm in the rear cargo area

of the Kia in a shoebox.  *Id.* at 61-63.  At least one firearm was also found in the blue Ford

Excursion.  *Id.* at 84-85

Mr. Elliott was believed to be associated with two street gangs, one of which was

associated with the colors of the shirt he was wearing.  *Id.* at 40-42, 63-64.  Officers checked Mr.

Elliott's criminal history and found that he had a juvenile adjudication for second degree

burglary and a felony drug conviction.  *Id.* at 46.

Mr. Elliott was arrested and detained on suspicion of possession of a weapon by a

previous offender with a prior burglary conviction**,** Colo. Rev. Stat. § 18-12-108(1), (2)(c), and

possession of a weapon by a previous offender with any prior felony, C.R.S. § 18-12-108(1).

The victim of the alleged armed robbery had not been identified or interviewed at the time of the

August 6, 2019 bond hearing. *Id.* at 65.

3.      The August 6, 2019 hearing was conducted by Arapahoe County District Judge

Shay Whitaker.  Based on the foregoing information, the People requested that Mr. Elliott be

detained without bond on the anticipated charge of possession of a weapon by a previous

offender, based on the strength of the People's evidence ("Proof Evident, Presumption Great").

*Id.* at 89-97.  The prosecution emphasized Mr. Elliott's danger to the community if released.

Defense counsel responded that the prosecution must prove (1) proof evident, presumption great, (2) significant peril to the community if Mr. Elliott is released, and (3) that Mr. Elliott had been convicted of a specific predicate offense, i.e., burglary within the prior 10 years. *Id.* at 97-100. Regarding the third element, the defense argued that the People relied on Mr. Elliott's prior juvenile adjudication for second degree burglary, but the court was not in a position to take judicial notice of that adjudication. *Id.* at 100-01. The defense also noted that the disabled individual whom Mr. Elliott helped out of the Kia, who allegedly had a similar record, had been released on a $10,000 bond. Counsel suggested that the only reason the People were distinguishing Mr. Elliott was that he had recently been acquitted of murder and requested that a bond be set for him. *Id.* at 103-04.

The court agreed that a prior burglary conviction was a prerequisite for a no-bond hold on a possession of a weapon by a previous offender charge, and it indicated that it could not tell from the information provided whether Mr. Elliott had been finally adjudicated delinquent in the prior second degree burglary case. *Id.* at 104-08. The court acknowledged that it had "specific concerns" about community safety and flight risk, noting that Mr. Elliott had eight failures to appear in his record and was rated a "high risk" by the pretrial report. *Id.* at 108-09. Nevertheless, the court found that the People had not carried their burden as to all three elements required for a no-bond detention and set bond at $30,000 cash or surety. *Id.* at 108-09. There was no discussion by counsel or the court of the evidentiary standard applicable to setting the amount of the bond, or the findings required, or constitutional issues under the U.S. Constitution, or whether Mr. Elliott could afford to pay the bond.

4.      On August 7, 2019 the prosecution filed a Complaint and Information in Case No. 19cr2440, charging Mr. Elliott with two counts of possession of a weapon by a previous offender.  ECF No. 1-14.

5.      On August 8, 2019 the prosecution filed a motion to enhance the bond.  ECF No. 1-11.  The motion stated that after the August 6, 2019 hearing before Judge Whitaker, the victim of the crime had been contacted and had identified Mr. Elliott as the individual who had robbed him at gunpoint and pistol whipped him on August 2, 2019.

The motion also reported that Mr. Elliott's criminal history included two juvenile adjudications for misdemeanor theft, a juvenile adjudication for false reporting, a juvenile adjudication at the felony level for second degree burglary, an adult felony conviction for possession of controlled substances with intent to distribute, and an adult misdemeanor conviction for aggravated motor vehicle theft.  Mr. Elliot had also been charged with murder, but he had been acquitted and released from custody on June 19, 2019, approximately six weeks before the August 2 incident.  The motion also stated that, while being arrested on an outstanding warrant in 2017, he reportedly tried to reach something under a pillow, where a gun was found Finally, the motion reiterated that Mr. Elliott was associated with the RBG gang and the Most Hated Gangster Crips, and it indicated that he was with documented RBG members when he was contacted on August 2, 2019.

Based on this information the People requested "a substantial increase in bond," asserting that "defendant is a significant threat to the community."  *Id.*

6.      On August 12, 2019 defense counsel filed an objection to the People's motion to enhance the bond.  ECF No. 1-10.  Defendant argued that the prosecution had already argued Mr.

Elliott had a "propensity to violence" during the hearing before Judge Whitaker, and the only new information since the court set the bond at $30,000 was the victim's alleged identification of Mr. Elliott as the person who robbed him and had a gun, but no discovery or other confirmation of that identification had been provided. According to the defendant, the motion is an attempt "to circumvent Judge Whitaker's denial of a no-bond hold by seeking to increase Mr. Elliott's bond beyond his means to effectuate what is constructively a no-bond hold in violation of Mr. Elliott's equal protection and due process rights under the Colorado and United States Constitutions." *Id.* at ¶ 12.

7.      On August 26, 2019 the People filed a second Complaint and Information against Mr. Elliott arising from the August 2, 2019, Case No. 19cr2654. ECF No. 1-8. Mr. Elliott was charged with nine counts: (1) aggravated robbery, C.R.S. § 18-4-302(1)(b); (2) conspiracy to commit aggravated robbery, C.R.S. § 18-4-302(1)(b); (3) assault in the second degree, C.R.S. § 18-3-203(1)(b); (4) menacing, C.R.S. § 18-3-206(1)(a)/(b); (5) possession of a weapon by a previous offender with a prior burglary conviction, C.R.S. § 18-12-108(1), (2)(c); (6) possession of a weapon by a previous offender with any prior felony, C.R.S. § 18-12-108(1); (7) theft, C.R.S. § 18-4-401(1), (2)(e); and (8, 9) two counts of a violent crime sentence enhancer. The People requested a bond of $250,000.

8.      District Judge Andrew Baum set bond in that amount $250,000 by endorsing that amount on the Complaint and Information on the day that it was filed. *Id.*

9.      On August 29, 2019 the Arapahoe County Judge Anne Ollada held a hearing concerning Mr. Elliott's bond in both cases (Nos. 19cr2440 and 19cr2654). ECF No 1-7 (transcript). Defense counsel asked the court to set a personal recognizance bond. *Id.* at 23.

Counsel stated that Mr. Elliott's family including his mother, grandmother, sisters, uncles, and stepmother live in the area; he could stay with his uncle or stepmother; he had been working two jobs; he has a girlfriend who attends his court dates when she can; and he would be amenable to pretrial supervision and GPS monitoring. *Id.* at 23-24. Alternatively, because Mr. Elliott does not have the ability to post the $30,000 bond set by Judge Whitaker, the court should set a "more reasonable" bond. *Id.* at 24. Counsel did not address the community safety issue as such.

The People countered that Mr. Elliott was rated high risk with a grade of negative four; he had refused to be interviewed by pretrial services; he had five failures to appear plus additional failures to appear in municipal court; he had prior juvenile adjudications and an adult felony, including burglary and drugs; he was charged in this case with aggravated robbery; he had been released from custody only a few weeks prior to this incident; five weapons were recovered in this case; the victim objected to any reduction of the bond; according to "information we have," his mother and grandmother who were not present were "not in his life," and his girlfriend was moving to Texas; and Mr. Elliott was associated with a violent gang. *Id.* at 24-26. The People argued that Mr. Elliott posed a significant safety risk to the community and the victim, and that bond set by Judge Baum was appropriate. *Id.* at 27.

Defense counsel replied that Mr. Elliott does have ties to the community, that his gang affiliation is irrelevant, and that either a personal recognizance bond, or at least no more than the scheduled amount (which was not identified), would be appropriate. *Id.* at 27.

The court noted that the Pretrial Report graded Mr. Elliott as a high risk. In addition to that, the court indicated that it would consider the charges brought against him in the two cases; the guidelines of the Chief Judge (not identified); and "the safety to the community, which is

where this is really pumping up, in my opinion, the setting of the bond." *Id.* at 28.  The Court found that the bond set by Judge Baum was appropriate, but because the two cases were filed separately, she would reduce the bond by the amount of the first case to $220,000, cash or surety, with GPS monitoring as a condition.  *Id.* at 28-29.

     10.     On September 25, 2019, the People dismissed Case No. 19cr2440.

     11.     On November 5, 2019 Judge Ollada held a preliminary hearing in Case No. 19cr2654.  ECF No. 1-3 (transcript).  The People called two Aurora police officers who provided the following information, some of which was supplied by the witness who called the robbery in; some by officers who viewed surveillance videos taken at the Aurora Mall minutes after the robbery; and some by the victim of the robbery who was contacted by one of the testifying police officers on August 7, 2019.

     The events began when an individual, identified by one officer as Ziar Daniel and by the other officer as the defendant, set up a meeting with the victim at the Robinwood condominiums on August 2, 2019, ostensibly to buy shoes.  The victim, R.S., was robbed at gunpoint in the parking lot of the condominium complex while he was sitting in his car.[1]  Items stolen from him included a handbag or backpack containing a gun belonging to the victim's brother; a card holder containing the victim's ID and a credit card; his mobile phone; a cooler; his medical marijuana card; and some marijuana "wax."  The victim was pistol whipped by two assailants and sustained injuries, mostly to his hands which he was holding over his head to ward off the blows.

     By the time police arrived at the scene the victim and the assailants were gone.  However, the witness, a UPS driver, had described the individual he saw committing the crime as a black

---

[1] I am using the victim's initials, as I am unsure whether his name has been made public.

male wearing a red shirt and black pants.  Mr. Elliott and others were filmed by surveillance videos at the Aurora Mall minutes after the robbery in two vehicles believed to be associated with the robbery.  Ziar Daniel and Mr. Elliott were in a blue Ford Excursion.  Mr. Elliott was filmed getting out of the blue Ford Excursion, going over to the other vehicle, an orange Kia, and making assaultive motions towards the driver's seat of the Kia that the officers interpreted as reenacting the pistol whipping.  Mr. Elliott was either wearing or carrying a handbag/backpack taken in the robbery and was believed to have left it in the Kia before walking into the Mall.

Authorities recovered five handguns between the blue Ford Excursion and the orange Kia as well as several items taken from the victim.  The UPS driver was brought to the Mall for a show-up of Mr. Elliott, but he was unable to identify him as the person he had seen pointing a gun at and pistol whipping the victim.  However, the victim described the incident to Officer Jason McDonald.  The victim explained how the meeting at the Robinwood condominiums to trade shoes came about.  *Id.* at 39-41.  Then, while sitting in his car, two men walked up to his driver's window.  He rolled his window down, and they asked to see the shoes.  The victim said he was wearing them and invited them to hop in and look at them.  "Suspect 1" got into the victim's car in the passenger seat.  As the victim was untying the shoes, Suspect 1 pulled out a gun, pointed it at his face, and said, "give me everything."  The victim said "no," and Suspect 1 said "if you don't give me everything you've got, I'll shoot you."  The victim said, "go ahead and shoot me," and Suspect 1 then pistol-whipped him repeatedly over his head.  Suspect 2, who had remained standing at the driver's window, also produced a gun and pistol-whipped him, about a dozen blows between them.  Suspect 1 took the victim's cell phone which was in his pocket.  Suspect 2 took a Coach-brand wallet that was on the victim's lap, containing his

Colorado license and a Chase Bank card, and tried to take his keys.  The victim was able to hold

onto the keys, but the key fob broke off.  Meanwhile, while the two suspect were pummeling

him, a blue SUV drove up, and a third suspect got out, opened the rear driver's-side door of the

victim's car, and took a Coach-brand handbag that matched the wallet and contained his

brother's Smith and Wesson revolver and a gray box containing marijuana wax.  *Id.* at 40-44.

The victim identified photos of the stolen items that the police recovered from the

vehicles at the mall.  He was shown a photo of the blue Ford Excursion and identified it as the

suspects' blue SUV.  *Id.* at 44-49.  He was then shown a photo array, and within five seconds he

identified Mr. Elliott as Suspect 1, ten out of ten positive.  *Id.* at 49-51.  Officer McDonald also

testified to Mr. Elliott's 2017 class three felony drug distribution conviction and his 2016

juvenile adjudication for class four felony-level second degree burglary.  *Id.* at 51-52.

Following cross-examination and arguments of counsel, and construing the evidence

presented in the light favorable to the prosecution for this purpose, Judge Ollada found probable

cause as to all counts one through six, which were the only "prelim eligible" counts, and they

were bound over to the district court.  *Id.* at 80-81.  At the request of defense counsel bond was

"reserved."  *Id.* at 83.

12.     On January 3, 2020 counsel for Mr. Elliott filed a motion for bond modification,

ECF No. 1-2.  The motion asked the court immediately to hold a hearing pursuant to Colo. Rev.

Stat. § 16-4-109, to take evidence as to Mr. Elliott's circumstances, and then release him on a

personal recognizance bond.  *Id.* at 6.  The motion stated that Mr. Elliott could not afford to post

the $30,000 bond set by Judge Whitaker.  However, two co-defendants had "attainable monetary

bonds" set in their cases.  *Id.* at 2.  Defendant argued that Mr. Elliott's due process and equal

protection rights under the Colorado and United States Constitution were being violated.  *Id.* at

5-7.  An "unattainable money bond violates equal protection because a similarly situated person

could purchase his freedom while Mr. Elliott remains incarcerated solely due to his inability to

pay."  *Id.* at 6, ¶27.  Further, arguing that pretrial liberty is a "fundamental right" that may only

be abridged if the government's interest is compelling and the deprivation is narrowly tailored,

the motion asserted that the court did not consider a less restrictive means of incarceration and,

in settling an unattainable bond, "did not consider whether the bond imposed furthered

government interests in protecting safety or preventing flight risk."  *Id.* at 6-7, ¶¶28-29.  The

motion states, "Courts have held that the imposition of unattainable money bail violates due

process and equal protection where the court failed to take into account ability to pay and failed

to consider less restrictive means." (citing cases from the Fifth Circuit, the Eastern District of

Louisiana, and the California Court of Appeal).  *Id.* at 7, ¶30.  "To satisfy procedural due

process, an order of de facto detention requires that the Court consider Mr. Elliott's ability to

pay, find that pretrial detention is required by 'clear and convincing evidence,' and issue findings

on the record."  *Id.* at 7, ¶32 (citing *In re Humphrey,* 19 Cal. App. 5th 1006, 1036-38) (Ct. App.

2018), and *United States v. Salerno,* 481 U.S. 739, 751 (1987)).

13.     On January 10, 2020, the Arapahoe County District Court (Judge Michael Spear)

held a hearing.  ECF No. 1-1 (transcript).  Neither party offered evidence.  Defense counsel

reminded the court that Judge Whitaker had denied a no-bond hold in the first case but set a

$30,000 bond which, according to counsel, Mr. Elliott could not post.  Then, after new charges in

case 19cr2654, the court set a $220,000 bond, which Mr. Elliott could not post.  Counsel argued

that Mr. Elliott's constitutional rights under the United States and Colorado Constitutions were

violated "because Mr. Elliott's bond is monumental, and unaffordable, and he remains incarcerated solely based on his inability to pay. *Id.* at 3-4. Counsel stated that in the six weeks between when Mr. Elliott was acquitted and released (on the murder charge) and the August 2, 2019 incident Mr. Elliott had been looking for work and had been given a phone and a place to stay by family members. *Id.*

Counsel assured the court that Mr. Elliott would appear in court because most of his family lives in the area, and he could live with his mother or grandmother who are "more than willing" to assist him. *Id.* at 4. She said that Mr. Elliott had only one adult felony and one misdemeanor, and his five failures to appear were not in those cases. Colorado law and the bond statute require the court to "institute a bond," consider pretrial conditions, and avoid unnecessary pretrial incarceration." *Id.* at 5. Counsel suggested that GPS monitoring, pretrial supervision with check-ins, and a protection order would assure community safety and Mr. Elliott's appearance for court proceedings. However, "because the money bond is violative of his constitutional rights under the bail statute, under the constitution, we are asking the court to grant a personal recognizance bond, or in the alternative to grant a bond reduction at the very least commensurate with Mr. Elliott's codefendants, which was $10,000 cash or surety." *Id.* at 5.

The prosecutor responded that the two referenced codefendants were charged with weapons possession, not aggravated robbery. Mr. Elliott did not cooperate with Pretrial. In his monitored jail telephone calls Mr. Elliott did not speak with his mother or grandmother. He only spoke with his girlfriend and frequently said he doesn't have family support and wanted to move to Texas with his girlfriend. The People are concerned about his community ties but even more concerned about Mr. Elliott's criminal history at his young age, the fact that this incident

occurred five [sic] weeks after Mr. Elliott was released from custody, he was with other gang members, and five guns were found in their two vehicles. *Id.* at 6-8. The prosecutor reported that the victim "adamantly objects" to any reduction, and "I think the court is aware of some of safety concerns the People have for the victim, and steps that have been taken for that." *Id.* at 8-9. She acknowledged that the court had set "an incredibly high bond," but stated that this was appropriate in order to address the safety risk that Mr. Elliott poses to the community. *Id.*

The court noted that it needed to be cognizant of prior proceeding in the case, and that it looks to see whether there has been a change of circumstances since the county court set the bond; otherwise people could bring up the same thing over and over. The county court was aware that Mr. Elliott had not cooperated with Pretrial in providing information about his ties to the community and family support. And when the court looked through the file, it appeared that other than the preliminary hearing, "there hasn't been a whole lot of change of circumstances from what was originally presented to the county court judge when bail was set at $220,000 cash or surety." *Id.* at 9-10.

Judge Spear commented, "I am not here to make determinations about the constitutionality of such setting." *Id.* at 10. However, he went on to say that he understood that similarly situated defendants should be treated similarly, but that the argument that because a codefendant got a lower bond, another defendant should get the same was an oversimplification that he could not accept. Rather, the bond must be based on the circumstances the defendant has in the community and the charges against him. *Id.* Here, the only change in circumstances he could identify that might be beneficial to Mr. Elliott since his bond was set was the representations of counsel regarding family support, but those representations had not been

verified and were essentially cancelled out by the result of the preliminary hearing.  The Court declined to modify the bond, stating, "I simply do not see at this point sufficient information to grant the Court assurances that the bond will serve its necessary function unless the bond remains as set." *Id.* at 12.

14.     On February 7, 2020 counsel for Mr. Elliott filed a petition in the Colorado Court of Appeals for review of the trial court's order concerning bond pursuant to Colo. Rev. Stat. § 16-4-204.  ECF No. 1-17.  The petition asked the Court of Appeals to reverse and remand to the district court with orders to grant a personal recognizance bond.  *Id.* at 1, 38.  Defendant argued that in setting a bond that Mr. Elliott could not afford to post the Arapahoe courts violated his rights to equal protection and due process under the United State Constitution, as well as his rights under the Colorado Constitution and laws.

The 41-page petition speaks for itself, but in brief summary, the equal protection argument was articulated as follows: "A similarly situated wealthy person – charged with the same crime, with the same CPAT score and the same pretrial risk – could simply buy his way out of jail." *Id.* at 2-3.  The due process argument in summary was that "[a] court may not preventatively detain a person without a determination by clear and convincing evidence that no less restrictive alternatives will ensure court appearances and public safety." *Id.* at 3.

15.     On February 24, 2020 the defendant filed a motion for the appointment of a special prosecutor.  ECF No. 1-20.  The motion states that two of the prosecutors who have appeared in Mr. Elliott's case were also prosecutors in Mr. Elliott's murder case.

One of them, Laura Wilson, was admonished by the court in the murder case for misrepresentations concerning a certain witness. *Id.* at 1, ¶¶2-3. Based on that premise, and the positions Ms. Wilson has taken in the present case, defendant asserted that "DA Wilson and DA Steers have a personal interest in the outcome of this case requiring disqualification and the appointment of a special prosecutor." *Id.* at 3, ¶16.

16.    On March 11, 2020 the People filed a response to the motion for the appointment of a special prosecutor. ECF No. 21-2. The response argues that the motion provides no support for the claim that the prosecutors have a personal interest in the outcome of this case; that Ms. Wilson was assigned to the case because she is a member of the office's gang unit; and that the standards for disqualification have not been met. *Id.* at 5-6.

17.    On March 11, 2020 the court (Judge Spear) denied the motion for disqualification. "The attached motion fails to establish a personal or financial interest on the part of the prosecutors and the Court can find no special circumstances mandating the appointment of a special prosecutor." *Id.*

18.    On March 20, 2020 the defendant filed a "Forthwith Motion for Bond Modification to Allow for Immediate Release." ECF No. 1-21. In addition to rearguing the issues previously raised the motion expressed concerns about the current COVID-19 pandemic. The motion provided public information about the disease and asserted, "[t]he Arapahoe County Jail maintains dramatic overcrowding, poor sanitation, and holds a disproportionate number of people who are most at risk and/or come from communities that are particularly vulnerable to infection." *Id.* at 4, ¶11. Defendant asked the court to

order Mr. Elliott's release on a personal recognizance bond without a hearing, or alternatively, to hold an emergency hearing by telephone. *Id.* at 10.

19.      On the same day, March 20, 2020, the People filed a response. ECF No. 1-22. It stated that the defendant had provided nothing more than generally reported information about the disease and had not alleged that the virus would affect him in any unique way. *Id.* at 3. The response added that the Sheriff had reported no cases of COVID-19 in the facility; that all "patrons of the jail" were being actively screened to prevent contamination; and that the defendant had provided no support for its "vague allegation" that the facility would not provide adequate medical care in the event that Mr. Elliott did become ill. *Id.* The response reiterated the flight risk and community safety issues that it had previously expressed. It argued that, while the Colorado and United States constitutions prohibits excessive bail, there is no constitutional guaranty to bail in every case where a defendant is indigent. *Id* at 4-6.

20.      On March 23, 2020 the court (Judge Spear) denied the defendant's forthwith motion for bond modification and immediate release. ECF No. 1-23. "Based upon the nature of the charges and the motion filed, the Court denies the request." *Id.*

21.      On March 27, 2020 defendant filed a motion in the Colorado Court of Appeals for leave to supplement his pending petition. ECF No. 21-1. The motion provided general information about the COVID-19 pandemic similar to that provided to the Arapahoe County District Court.

22.      On March 30, 2020 a panel of the Colorado Court of Appeals unanimously denied defendant's request for a hearing and denied his petition for review. ECF No. 1-18.

23.     On April 6, 2020 defendant, represented by new counsel, filed the pending application for a writ of habeas corpus in this Court.  In the application Mr. Elliott asks this Court either to order his immediate release or to order the Arapahoe County District Court to hold, within 24 hours, "a thorough adversarial hearing that complies with the requirements for preventative detention described by the United States Supreme Court, which include making findings by clear and convincing evidence about whether he poses a flight risk and/or a danger to the community and, if so, whether conditions of release exist that could reasonably assure Mr. Elliott's presence at trial and the safety of the community."  ECF No. 1 at 8.  Simultaneously the defendant filed a motion for a temporary restraining order requiring his immediate release.  ECF No. 3.

The Sheriff, who is the named defendant, responded with a brief asking the Court to abstain under the *Younger v. Harris* doctrine, or alternatively, to deny Mr. Elliott's application for failure to exhaust remedies available to him in the state courts.  ECF No. 21.  Counsel from the Arapahoe County District Attorney's Office filed a notice of appearance on behalf of that office as an interested party.  ECF No. 13.  The DA's Office filed a brief supporting the Sheriff's position but alternatively asking this Court to deny the application on its merits.  ECF No. 23.

24.     On April 22, 2020, the Court conducted a telephonic hearing on the application. During the hearing defendant's counsel essentially abandoned the notion that this Court might order Mr. Elliott's immediate release.  Instead, the oral argument focused on the alleged procedural shortcomings of the state county and district court judges who considered the bond issue and asked this Court to order the state judges to reconsider the bond issue and do it right this time.

## II. ANALYSIS.

### A. *Younger v. Harris* Abstention.

Because abstention under the *Younger v. Harris* doctrine would end the discussion, I will

start there. Absent extraordinary or special circumstances, federal courts are prohibited from

interfering with ongoing state criminal proceedings. *See Younger v. Harris*, 401 U.S. 37 (1971);

*Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997).

1. Requirements for *Younger* abstention. "Before a federal court abstains, it must

determine that (1) the state proceedings are ongoing; (2) the state proceedings implicate

important state interests; and (3) the state proceedings afford an adequate opportunity to present

the federal constitutional challenges." *Phelps* at 889 (citing *Middlesex Cty. Ethics Comm. v.

Garden State Bar Ass'n*, 457 U.S. 423 (1982)).

*a. Ongoing Proceedings.* The petition indicates that trial in Case No. 19cr2654 is set for

May 4, 2020. That will not happen. Per its website and chief judge's orders, that court, like

many others, is not currently holding jury trials due to pandemic restrictions. But, obviously,

proceedings in the case are ongoing.

However, defendant argues the bond proceedings, which are the focus of the present case,

are no longer ongoing in the state court. That appears to be true. In theory defendant could go

back to the state district court yet again, perhaps this time clearly making the procedural

arguments that were articulated by counsel in the hearing in this Court. Arguably, however, the

first requirement for *Younger v. Harris* abstention is not met.

*b. Important state interests.* "The States' interest in administering their criminal justice

systems free from federal interference is one of the most powerful of the considerations that

should influence a court considering equitable types of relief."  *Kelly v. Robinson*, 479 U.S. 36, 49 (1986) (citing *Younger*, 401 U.S. at 44-45).  Like other states, Colorado has an "important state interest" in the enforcement of its criminal laws.  *See, e.g., People v. Allee,* 740 P.2d 1, 9 (Colo. 1987).  This *Younger* element is clearly met.

c.  *Adequate opportunity to present federal challenges in state court.*  Mr. Elliott did have an adequate opportunity to raise the issues they are raising now in the state court.  He asserted due process and equal protection violations in Arapahoe County and in their petition the Colorado Court of Appeals.  He had the opportunity to argue for a more "robust" hearing in those courts.  He had the opportunity to seek review by the Colorado Supreme Court.  This element of *Younger* abstention is also clearly met.

2.  Exceptions to *Younger* Abstention.

Even if the *Younger* requirements are met, a defendant "may overcome the presumption of abstention 'in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown.'" *Phelps*, 122 F.3d at 889 (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971)).  But the defendant has a "'heavy burden' to overcome the bar of *Younger* abstention by setting forth more than mere allegations of bad faith or harassment." *Id.*

Courts consider three factors in determining whether a prosecution has been initiated in bad faith or to harass: "(1) whether it was frivolous or undertaken with no reasonably objective hope of success; (2) whether it was motivated by the defendant's suspect class or in retaliation for the defendant's exercise of constitutional rights; and (3) whether it was conducted in such a

way as to constitute harassment and an abuse of prosecutorial discretion, typically through the unjustified and oppressive use of multiple prosecutions." *Phelps*, 122 F.3d at 889.  Defendant has not shown that any of the exceptions applies.  Defendant did move for disqualification and the appointment of special counsel in the district court.  The motion was denied by the court as unfounded, and the issue was not raised again in the petition to the Colorado Court of Appeals or in the habeas application filed in this Court.  Accordingly, I find that no exception to the application of *Younger* abstention has been established.

### B. <u>Exhaustion of State Court Remedies</u>.

The Sheriff argues that even if I do not find that *Younger v. Harris* abstention is required, I should nevertheless deny the habeas application because defendant did not exhaust state remedies that were available to him.  I agree.

In the county and district courts defendant's consistent position was that the court was required to set a bond that he could post – either a personal recognizance bond or, at most, a $10,000 cash or surety bond.  The emphasis was not on the procedure but on the result.  To be sure, in a motion to modify bond filed after the $220,000 bond had been set, counsel included in paragraph 32 the sentence, "To satisfy procedural due process, an order of de facto detention requires that the Court consider Mr. Elliott's ability to pay, find that pretrial detention is required by 'clear and convincing evidence,' and issue findings on the record."  ECF No. 1-2 at 7.[2]

---

[2] Defendant cited *United States v. Salerno,* 481 U.S. 739, 751 (1987) in support of this sentence.  But *Salerno* addressed, and rejected, a due process challenge to a portion of the Bail Reform Act of 1984.  28 U.S.C. § 3141 *et seq*.  Under the Bail Reform Act, which applies to pretrial detainees in federal criminal prosecutions, the government must either prove flight risk by a preponderance of the evidence <u>or</u> dangerousness to the community by clear and convincing evidence.  28 U.S.C. § 3142(f).  *See United States v. Cisneros,* 328 F.3d 610, 616 (10th Cir. 2003).  The sentence in the motion to modify is not supported by *Salerno*.  Requiring proof by clear and convincing evidence in order to set an "unattainable bond" based on flight risk in a Colorado criminal prosecution would expand Colorado law beyond what

However, even in the hearing on that motion before Judge Spear, neither party presented evidence, and neither party said anything about the findings the court needed to make or the standard of proof or any other aspect of the procedure to be followed.

During the entire course of hearings in the county and district courts the only "evidence" presented by either party was what the courts could take judicial notice of – the Pretrial report grading Mr. Elliott as a "high risk;" Mr. Elliott's criminal history; and the charges that were filed against him in the two cases arising from the August 2, 2019 incident.  The rest of what was presented amounted to assertions of counsel.  Defense counsel represented that Mr. Elliott could not afford to post more than a $10,000 bond, and that he had strong family support and ties to the community.  The prosecution represented that Mr. Elliott's ties to the community were not strong, that he was an active gang member, and that the victim of the armed robbery had identified Mr. Elliott as the individual who got into his car, pointed a gun, threatened to shoot him, and pistol whipped him.

Even in his petition to the Colorado Court of Appeals the emphasis was on the result, i.e., a remand with an order to set a personal recognizance bond, not on the procedure required to be followed in the trial court.  Defendant's singular focus on the procedure that the trial court judges should have followed did not emerge until the hearing on his habeas application.  We cannot know what the Arapahoe judges or the Court of Appeals panel might have done had the arguments made in the hearing in this Court been presented in those courts.

---

even the Bond Reform Act requires.  Notably, the evidence that Mr. Elliott had eight previous failures to appeal in cases where he faced far lesser sentences, and that the Pretrial Report graded him as a "high risk" would seem to support a finding that he is a flight risk under either standard of proof.

The Arapahoe judges did not accept the proposition that they had to set a bond that Mr. Elliott could afford, nor should they have under Colorado law.  *See People v. Jones,* 489 P.2d 596, 599 (Colo. 1971) ("The right to bail does not amount to a guarantee that every defendant who is charged with a crime will be released without bail if he is indigent.").  Colorado law requires courts to consider flight risk and community safety issues in setting bonds.  "The type of bond and conditions for release shall be sufficient to reasonably ensure the appearance of the person as required and to protect the safety of any person or the community, taking into consideration the individual characteristics of each person in custody, including the person's financial condition."  Colo. Rev. Stat. § 16-4-103(3)(a).  The court is entitled to consider a number of factors including the nature and extent of family relationships of the person in custody; the character and reputation of the person in custody; the likely sentence if convicted; the individual's prior criminal record; any facts indicting the possibility of violations of the law if the defendant is released without certain conditions; any facts indicating that the defendant is likely to intimidate or harass possible witnesses; and any other facts indicating strong ties to the community and that the defendant is not likely to flee the jurisdiction.  Colo. Rev. Stat. § 16-4-103(5).

It is evident in the record of the case that the judges did consider these factors, based on the information presented to them.  The county court set, and the district court affirmed, a bond and conditions that, in their judgment, were "sufficient to reasonably ensure the appearance of the person as required and to protect the safety of any person or the community."  Defendant's "appeal" was considered on an expedited basis by the Court of Appeals and was rejected.

Moreover, the defendant elected not to seek review by the Colorado Supreme Court. This case is no longer just about whether Mr. Elliott is released.  Defense counsel want to change the procedural way Colorado judges make bond decisions.  Defendant's demand before this Court that the state court conduct a "robust" hearing raises questions of broad significance such as whether the trial court must hold an evidentiary hearing; whether the court must make all its findings by "clear convincing evidence;" and who has the burden of proof on each of the various factors the court considers, including the defendant's ties to the community and his financial condition.  In my view, the State's highest court should at least have an opportunity to consider these issues before a federal court intervenes.

During the hearing I pressed counsel to explain why defendant did not seek Supreme Court review.  The response was that (1) defendant was not required to seek extraordinary relief in the Supreme Court in order to exhaust his state remedies, citing *People v. Jones,* 346 P.2d 44 (Colo. 2015); and (2) Mr. Elliott suffers irreparable harm every day he is in jail, but "in a previous case we had sought review from the Supreme Court, and that substantially delayed the proceedings and resulted in a summary denial without an explanation."[3]

The second reason did explain what motivated counsel not to seek Supreme Court review.  However, what the Supreme Court would have done and how long it would have taken in this case are matters of speculation.  Indeed, the Court emphasized the need for prompt consideration of such cases in *Jones.*  346 P.3d at 46.

---

[3] There is no official transcript of the April 22, 2020 hearing.  I have obtained a rough draft transcript from my court reporter to supplement my recollection and notes.

The *Jones* case got to the Colorado Supreme Court on a petition for the exercise of the Court's original jurisdiction under Colorado Appellate Rule 21.  In reviewing Colorado's statutory scheme for the setting of bonds, the Court stated that Colo. Rev. Stat. § 16-4-204 provides the exclusive procedure for appellate review of bond orders such as those issued by the Arapahoe county and district courts in the present case.  346 P.3d at 49.  The Court did not explicitly address whether a petitioner who loses a § 16-4-204 appeal in the Court of Appeals is precluded from seeking Supreme Court review by petition for a writ of certiorari, though that might be implied.  However, the Court did hold that the fact that the statute provides an exclusive appellate right "in no way limits [the Supreme Court's] exercise of its original jurisdiction."  *Id.* at 51.  Defendant does not dispute that there was an avenue to seek review by the Colorado Supreme Court, though Mr. Elliott elected not to pursue it.

The questions presented in the pending habeas case, however, are (1) whether Mr. Elliott was required to exhaust available state remedies before seeking relief in federal court pursuant to 28 U.S.C. § 2241, and (2) if so, did Mr. Elliott properly exhaust his state remedies.  I answer the first question "yes" and the second question "no."

"A state prisoner generally may not raise a claim for federal habeas corpus relief unless 'he has exhausted the remedies available in the courts of the State.'"  *Selsor v. Workman,* 644 F. 3d 984, 1026 (10th Cir. 2011) (citing and quoting 28 U.S.C. § 2254(b)(1)(A)).  This applies as well to § 2241 petitions.  "We have held that this exhaustion requirement 'is a prerequisite for § 2241 habeas relief, although we recognize that the statute itself does not expressly contain such a requirement.'"  *Farris v. Allbaugh*, 698 F. App'x 950, 957 (10th Cir. 2017) (unpublished)

(quoting *Garza v. Davis,* 596 F.3d 1198, 1203 (10th Cir. 2010)). *Accord Curren v. Raemisch,* 566 F. App'x 708, 710 (10th Cir. 2014) (unpublished).

To exhaust his state remedies, "a habeas petitioner 'must have first fairly presented the substance of his federal habeas claim to state courts.'" *Curren,* 566 F. App'x at 710 (quoting *Hawkins v. Mullin,* 291 F.3d 658, 668 (10th Cir. 2002)). "To have properly presented his claim, the petitioner must have presented his claim through one 'complete round of the State's established appellate review process.'" *Id.* (quoting *Woodford v. Ngo,* 548 U.S. 81, 92 (2006)). These requirements reflect considerations of comity, not power. *See Fay v. Noia,* 372 U.S. 391, 418 (1963).

I find that defendant did not fairly present the substance of the procedural arguments he has made in this Court to the Arapahoe county and district courts or to the Colorado Court of Appeals. I further find that seeking review by the Colorado Supreme Court was another available remedy, but Mr. Elliott did not exhaust that remedy either.

## CONCLUSION

This case lies at the intersection between *Younger v. Harris* abstention and exhaustion of remedies. The underlying principle, however, is the same. Federal courts should be wary of intervening in state court criminal proceedings if the applicant has not first taken advantage of available opportunities to remedy the alleged federal constitutional violations in the state court. Because I have found that Mr. Elliott did not take advantage of state remedies that were available to him, I deny his application.

## ORDER

Petitioner' application for habeas corpus relief is denied.  His motion for a temporary

restraining order, ECF No. 3, is denied as moot.

DATED this 4th day of May, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge